May it please the court, my name is Summer Nelson and with me at council table is co-counsel Rebecca Smith and we represent the Plaintiff's Appellant's Western Watersheds Project at all in this matter. And I understand I have 20 minutes, I want to reserve five minutes for rebuttal please. Keep track of your time and we'll try to get you there. Yes your honor. Your honors, this case is about one of our nation's most iconic species, the plains bison that used to roam across the continent in tens of millions and were nearly exterminated until just about 25 remained in the remote exterior of Yellowstone National Park and their numbers have recovered to just a tiny fraction of those original tens of millions. How many are there? Your honor, there's approximately, it fluctuates between 2,000 to 5,000. How many bison remain in the United States? Oh across the United States? You're talking about Yellowstone, I'm asking about all the bison. Oh your honor, I'm not sure the exact number across the United States but most... There are thousands aren't there? There are and they're primarily in commercial herds and have been... Don't exaggerate, the Yellowstone group is special but it's only a fraction of the number of bison. That's correct your honor, I was referring to those remaining in Yellowstone which are commonly understood to be the last refuge of the descendants of that original plains bison and that retained their original genetics but I understand your point your honor and these unique and valuable resource and at stake is the continuing viability of that population. I have a question just sort of procedurally, the FEIS will expire in 2014 or at the end of 2014, is that correct? That's right your honor. What happens next? Assuming that we don't intervene in some way with a decision, is there supposed to be a re-evaluation? Does there have to be a supplemental EIS? What would naturally happen in the course of things? Well your honor, the Western Watersheds Project contends that an SEIS is necessary and precisely because... Well no, I'm trying to get away from you prevailing in the lawsuit. If just everything were left alone, if this lawsuit didn't exist, what would happen when that ends in 2014? What is the procedure in place either by statute or regulation leaving aside any lawsuits? Well your honor, there's nothing to indicate that the agencies are planning to change, to do any supplemental environmental impact statements. They did one adaptive management or one status review, excuse me, in 2005 and under NEPA generally the agencies will review actions every five years but there hasn't been another one since I believe that one was in 2005. There's nothing to indicate that they're planning to do any new analysis or any modeling and so essentially all the modeling and analysis... So it would basically be the end of the plan? Basically should be your honor, it's the end of the impacts analysis, it's the end of their modeling and yet they're all indicators from the agencies are that they will continue implementing the bison management plan and so all indicators are they're going to continue doing that without having any analysis beyond 2014. And there was a draft EIS submitted in 2010, what is the current status of that? That one is regarding just one aspect. Correct, what is the status of it? I believe it's still a draft environmental impact statement and there's no decision yet. That's on the vaccination question? That's right. Okay. Yeah, that one was all the new information and change circumstances that have arisen over the last 12 or so years since the plan was implemented. So in addition to the lack of analysis and modeling of impacts that's resulting from all of that expiring in less than two years, the agencies have also recognized in the record that there's substantial new information regarding bison brucellosis and management of transmission risk and yet they've done no actual significance determination and they've repeatedly refused to do any kind of supplemental environmental analysis and indeed haven't even done a supplemental information report or an environmental assessment or any kind of formal assessment that combines all this new information and circumstances in order to determine if the changes and the information are significant and whether they need to do a supplemental EIS. I mean in the record they say multiple times including at 8-11, 5-67, 8-35, they all say this substantial new information. They say at 8-35 to 8-36 in excerpts of record assumptions and predictions were inaccurate they say it's debatable whether these change circumstances represent a radical departure from the EIS and ROD and whether current implementation is meeting the goals established in the initial environmental review. So they're essentially conceding that things have changed so dramatically that they're not even sure that the justification for the plan exists or that they can meet their goals and that just goes to the fundamental premises and purposes of the plan. They've been undermined or called into question and yet they're continuing forward without involving the public or determining. Where were these concessions counsel? These were there were some internal documents excerpts of record 8-11, 5-67 and 8-35 all refer to the fact that they have substantial new information and then 8-35 to 8-36. Who authored those documents? Those were park service and I believe they were park biologists. They were a note to the administrative record, IBMP expectations and realizations, their surveillance plan and an IBMP briefing statement so that would have been. Are those attributable to the agency if they were internal documents expressing the employee? I believe the way that they were, yeah that's a good question your honor. I mean I think they were probably would be presented as the view of the agency. They were and one of them is a formal briefing statement that's the park services presentation to the rest of their IBMP partners when they have their meetings and so that one would have been their position representing to the other agencies. There is substantial new information and yet there's still none of those documents actually use the word significance or evaluate the information under the significance criteria of NEPA or look at how does this impact you know their ability to reach the goals. Was the park agency the driving agency in terms of developing the plan? Was it a collective or collaborative effort? It was your honor. It was a long convoluted history but they ended up settling a lawsuit and then working together to the Montana state agencies and three federal agencies. To me that creates a little bit of a problem with your argument if you try to say that some employees of one of the collaborating agencies made statements that might indicate that there was significant change but those were not incorporated or adopted by the other agencies. What does that do to your argument regarding whether or not it's a concession on the part of the agency group that developed the original plan? Yes your honor well I think the it is a collective record even though this came from the park service that they all cooperatively implement the IBMP and review the information and decide every couple years you know when they sign operating instructions or make adaptive management changes they're all deciding together what the state of the IBMP is and what will be going forward and and also just looking at the record itself even if the agencies weren't conceding this the record indicates that there is significant new information and circumstances that impact the fundamental premises and and whether it's significant new information or whether we must show significant new impacts there's both here. What's the significance? Well your honor there's several uh the whole IBMP was premised on the fact that there were seen as not a significant enough threat to require any sort of intensive management the way that bison were subject to hands-on management. They thought that there was no way to quantify the risk of transmission between bison and cattle and there were also predicted severe economic consequences to the livestock industry if a transmission did occur and all of those things have seen changes. The cattle operation. What are the changes? Your honor a few of them are the fact that in one of the primary areas that the bison migrate outside of Yellowstone is an area called Horse Butte it's a peninsula on the Gallatin National Forest where the bison have traditionally migrated and there was a cattle grazing allotment on the forest and there was private land grazing when the IBMP was written and so when they evaluated the impacts and did a cost-benefit comparison of alternatives they were looking at what will the impacts be to cattle operations right here on the boundary of the park and since then those cattle have been removed the the allotments closed and the private landowners have declared it a bison friendly zone and there's no cattle there and then there was a study that actually quantified the risk of transmission which the agencies thought was impossible at the time and although it shows that the IBMP does maintain separation between bison and cattle it also says that in most years the transmission risk would be zero or nearly zero without any management and it sets forth alternatives that would be viable for protecting the livestock industry and managing the minimal risk of EIS was created the agencies didn't think was possible it wouldn't meet the purposes of their plan and now there's evidence that they may be able to meet the purposes of their plan if they were to evaluate collectively all of this new information and change circumstances. Why is it significant that the bison be let into that area? Well your honor the record also indicates that migrations onto areas outside of the park is critical for the long-term survival of this the Yellowstone bison population and one scientist has said at least 600 to 800 bison need to be able to access land outside of Yellowstone and the agencies have documented impacts to the bison population that are adverse and that were not information they previously got. Why is it critical that they have access? Your honor I believe it's just a matter of winter habitat primarily that the agencies recognize that Yellowstone is not an intact ecosystem by itself and that it needs the wildlife naturally migrate onto lands outside of the ecosystem or out of the park boundaries just like the elk population uses gallatin national forests private lands state lands. Will the bison die if they don't have access? Well that's what some of the scientists have said that their long-term survival is. Do they die now? Do they die now because they don't have access? Well your honor it's more of a matter of genetic they're in genetic integrity and the long-term impacts of the population right now they die. What do you mean by genetic integrity here in that context that they presumably mate with the bison they're with so how will it make a difference whether they were in the gallatin or not? Well your honor it's because of the access to habitat and it's really the that's what and this actually highlights the point that. Is there a minimum number of bison required to maintain appropriate genetic diversity? Is that the issue? That is part of the issue particularly as far as. That's the minimum number 3,000 I saw somewhere in this but I don't know if that's right. Right well and that's part of the problem is there's several numbers given in various places of the record and that's one of the things that doing a supplemental EIS would offer. Are you disputing the 3,000 number? Do you dispute the 3,000? According to the record according to the Park Service's own biologists at excerpts of record at 809 they say that they need to regulate the bison population between 2,500 and 4,500. There's others. 3,000 is between. It is your honor but okay they're saying that. So what's the problem? Well your honor part of the problem is that the agencies have also said in the record such as at excerpts of record 816 that the expected long-term effect of their culling actions is a slow-growing unstable bison population that may not respond quickly to future challenges and that over time it could diminish the ecological role of the largest remaining free-ranging bison population and diminish ecological processes within the park. Is that a problem right now? It appears to be from the record and that's that's exactly one of the things that a supplemental EIS and an impairment determination would help the court and the agencies and the public determine. There's all this science and a lot of references. You've studied this and I'm asking you what is the impact on the bison of this long-term prediction? Well your honor the agencies have already documented that it has impacted the demographics the age and sex ratio of the population that it's had differing impacts on the females and calves and so they've already as of today. Well it appears that there's a lot of evidence in the record your honor that it is impacting the viability and that's one of those things that appears over time. Over time? I'm asking today. Your honor I believe the record does show that there has been impairment but and a primary concern is that ongoing actions are having either uncertain impacts that the primary purposes of you know thinking before they're acting knowing what the impacts actually are and they talk in the record about they make a recommendation that they assess from time to time the real versus the predicted impacts and that's showing that that they don't know what the real impacts are and those that's the very purpose of NEPA and if the agencies themselves are saying we need to look occasionally at the real impacts versus the predicted impacts then there's a real problem under NEPA as well as their ongoing duties under the Park Service Organic Act, the Yellowstone Enabling Act, as well as the Forest Management Act. Counselor you're down to three minutes if you wanted to save some rebuttal time. Thank you your honor. Good afternoon your honors. May it please the court. My name is Tekla Hanson-Young and I represent the United States. I would like to use my time to respond to a few of the points made by Western Watershed Projects Council in her opening remarks. Would you first answer the questions that I asked counsel. What will happen in the absence of a lawsuit or any requirements of the court in 2014 when this plan or its projected termination comes to be? Will there be an EIS at that time, a supplemental one? Is there some re-evaluation that will occur anyway? There's, I have a couple points in response to that. First of all, the Park Service informed Western Watersheds that the plan has no, the IBMP has no official sunset date and that's in a letter to the plaintiffs at the administrative record 7415. However, the information that Western Watersheds is pointing to that talks about the analysis only going through to 2014 refers to the population modeling that was done in the FEIS. Well, the fundamental question I'm asking is what, will a supplemental EIS be prepared in the normal course of things and if not, what other assessments would happen in the normal course of things and in what form and at what time? At this stage, the agencies have not decided to do a supplemental EIS, but they haven't decided one way or another. There's, the analysis is still good through, the analysis of the impacts on the bison population is still good under the original FEIS through 2014. Assuming that these new things don't require something supplemental. Having said that, the agencies that form the, all of the agencies, the three federal agencies and the two state agencies meet several times a year and the meetings occur over a period of several days where the agencies get together and discuss bison management and what exactly needs to be done, what new information there is. And the plaintiffs in this case have participated throughout those meetings and presented a lot of this information to the agencies and the agencies discuss that and decide on an ongoing basis whether or not there's a need to supplement the environmental analysis, whether there's any new information that requires adjustments to bison management. So really it's an ongoing process. Is that process, from the government's perspective, expected to continue indefinitely into the future? The process would continue. That you've just described. Yes, it would continue indefinitely, you know, to the extent that there's no significant new information that requires supplementation of the EIS. Now having said that, the agencies have also, in 2010, prepared a draft environmental impact statement concerning the development of remote vaccination programs. Right, that's what I was asking about earlier as to whether that's still in draft form or. That is still in draft form. The agencies received over 60,000 comments on the draft and are taking the time to go through those comments and respond to those comments. The plaintiffs in this case have also, in fact, commented on that draft EIS and brought up all of these issues that they raised in this complaint. And underneath the regulations, the agencies will be obligated to respond to those comments raised by the plaintiffs. So while the draft EIS is designed to evaluate the remote vaccination program, it also touches on a variety of other issues. As explained in the briefs, it addresses the bison genetics issues. It addresses transmission of brucellosis from elk to cattle. Now peripherally, but it does address those issues as well. Recently, the agencies also, in 2011 and 2012, prepared a, at the end of the year, it was signed by all the partners in early 2012, a determination of NEPA adequacy responding to the plaintiffs' concerns about the genetics information. That's available on the, it's not cited in the briefs, it's available on the IBMP website, which is referenced in the brief. And so the agencies are addressing this information as it arises. And thoroughly acknowledge that there are a lot of uncertainties with regards to bison management, with regards to whether there's new information. And, in fact, the FEIS anticipated a lot of these uncertainties, and that is why the IBMP was established as an adaptive management program, which would allow the agencies to take into account new information and respond to the new information in adjusting its management. But statutorily, or at least by decision, at some point, new information requires a supplemental EIS. That is correct. So what is that point, and why isn't it reached in this case? Well, in this case, the plaintiffs point to seven pieces of information that they argue justifies supplementing the EIS. And, in fact, as we have argued in our briefs, all of the information pointed to by the plaintiffs was considered and analyzed, potential environmental impacts of that information was analyzed in the FEIS. And the new information does not arise to the level of significance under NEPA that would require the supplementation of an EIS. Now I can go through that information individually and respond to, in particular, some of the points that the plaintiff's counsel made in her opening remarks. She indicated that the agency had, in fact, conceded that this information or that information generally was significant or would require supplementation. That's not correct, in fact. If you look at the record citations that she pointed to, one of the citations referred to the uncertainty surrounding the vaccination of bison. And it didn't say that the information that has come to light or the fact that there's not a remote vaccine that works in bison constitutes significant information. And that was at ER 811. The counsel, what is the significance of the recitation of all of the difficulties in carrying out the intentions of the original plan? Well, there's the fact that the plan has taken longer to implement or the fact that certain elements of the plan have taken longer to implement, and in particular the development of a vaccine that would help reduce the spread of brucellosis. And the fact that that has taken longer to come to fruition doesn't necessarily mean that the original analysis in the FEIS is invalid. And with respect specifically to the vaccine program, that is, again, undergoing its own EIS process. So that's not ‑‑ there's no reason for this court to require the agencies to supplement the original FEIS to address the vaccination program. I'm sorry. So because that's already being addressed in a new EIS. The other citations that she referred to, if ‑‑ When is that EIS supposed to be published? The agencies are working on it right now. I do not have an exact date from them as to when they expect it will be finished. But, again, the agencies are going through and responding to 60,000, over 60,000 comments. And so responding thoroughly to those comments takes a lot of time, as well as the fact that there's a lot of new, you know, there's new information that is coming in and the agencies are still working on developing a remote vaccine. On page 567, which was another page that was cited, it says, since the record of decision was signed, the signatories have collected substantial new information regarding bison and the management of disease risk and suppression. Progress has been slow in completing the plan's three successive management steps to incrementally increase the tolerance of bison moving outside the park. That's not just the vaccine. That's talking about trying to manage the bison moving outside the confines of the park. So, my response to that is that simply saying in a note to files that there's substantial new information doesn't mean that the new information is significant for NEPA purposes requiring an EIS. And it's the plaintiff's burden to demonstrate what the agency should have done or what the agency needed to supplement. Well, what does that mean, then, if the reporter is saying that the signatories, that includes collectively all of the people who participated in designing the plan, all of them have collected substantial new information, what does that mean, then, for purposes of the plan? What does that mean? There's no doubt that there is a lot of new information that's come to light since 2000, when the IBMP was initially adopted. The question for this Court is whether that new information is significant for NEPA purposes. And the information pointed to by the plaintiffs in this case is not, does not rise to the level of significant for NEPA purposes. Why not? Well, let's, I mean, most generally, because the information was anticipated for in the FEIS, the potential impacts of this information was analyzed in the FEIS, and to the extent that there's new information, it's not actually that different. So, for example, the plaintiff's site to the- What about the removal of cattle from the area that was being discussed at oral argument today? Sure, and I think it helps to speak about this information in the most concrete terms possible. The removal of cattle from the Horse View area was actually anticipated for and discussed in the FEIS and in the ROD. The record sites are SCR 122, 128, 1301, and in fact part of the plan was to provide for the removal of cattle outside of the park to allow more winter range for bison. What is your view of the minimum number of Yellowstone bison that are required to maintain genetic diversity? What's your view of the record on that? There's several different numbers. So the FEIS originally stated that there would need to be a minimum of 580 throughout the entire herd. Now, none of the plans or none of the alternatives that were analyzed in the FEIS actually would have permitted the population to fall to 580. The lowest number was 1,700. This plan that was adopted, the IBMP, would not have permitted the herd to fall below 2,100, and below 2,300 would implement strict procedures to prevent the lethal removal of bison. Under the plan also, the target population is 3,000 bison, and the reason for that is because once bison get above 3,000, they start to leave the park, and then the park loses jurisdiction over the bison. Now, the new studies that have come out, or the studies that have come out since the FEIS, have posited that there needs to be a population of between 2,000 and 3,000 throughout the herd in order to maintain genetic diversity. That is what the plan is providing for. Now, there's some discussion in the record concerning different subpopulations of Yellowstone bison, and some of the studies that the plan has pointed to indicate that there's two breeding groups in the Yellowstone herd, the northern and the central breeding groups. There were some studies that came out in the mid-2000s, 2005-2006, that indicated that these might be subpopulations of bison, or there might be a need to maintain different numbers, or minimum numbers, in these different breeding groups. Those studies specifically were based on the assumption that there was no genetic interchange between those two breeding groups. What has come to light subsequent to those studies, and what the Park Service has considered, is that there is actually genetic interchange between those two breeding groups. The bison move back and forth. And so its management techniques of managing for 2,000 to 3,000 bison across the whole Yellowstone population is actually sufficient to maintain the genetic diversity of the Yellowstone herd. And in fact, that's supported by the most recent science that is cited to in our brief. And the Park has considered that information. So really, again, there is a lot of new information that has come out, but none of it is significant for NEPA purposes, because it doesn't change what was originally anticipated in the FEIS. And the plan has made a point that there's some indication that the science somehow indicates that the Yellowstone bison population is not viable or is not at risk. That's simply not the case. There was a petition that was filed to list the Yellowstone bison as endangered, and that was rejected. That petition is cited to, or the rejection of that petition is cited to in our briefs, and it discusses how well the herd is doing. Right now there's more than 4,000 bison in Yellowstone, and by all ways of looking at the herd, the herd is doing very well. I also wanted to address that one of the points that Western Watersheds made is that a reason for the need to supplement the EIS is about elk. Western Watersheds argues that elk should also be managed, or the fact that elk can pose a risk of transmission to cattle justifies supplementing the EIS. That's simply not the case. Again, the risk of transmission of brucellosis from elk to cattle was considered in the FEIS, and the management of elk was rejected as an option because the plan was designed to manage bison, which also posed a risk of spreading brucellosis to cattle. That risk hasn't changed. The plaintiffs point to a study in 2009, the 2009 Kilpatrick study, that indicated that the risk of brucellosis transmission from bison to cattle was near zero. But what the plaintiffs failed to acknowledge is that that study expressly said that the reason why the risk of brucellosis transmission is low is because of the IVMP, because the plan separates out bison both in space and time from cattle, and that's why the risk of transmission is so low. It's not because it's otherwise not a risk. And the last point that I'd like to make concerns the Western Watershed's arguments about the changed regulatory scheme. I'd like to just point out that the agency's, first of all, that argument was not made before the district court, and so therefore there's no administrative record before this court that would allow it to thoroughly evaluate what the agency's response to that, the changed regulations would be. Having said that, however, the fact that the regulations have changed somewhat doesn't eliminate all of the economic consequences of brucellosis transmission to Montana cattle. APHIS can still change Montana's brucellosis-free status and impose regulatory restrictions on the state, and there's still a lot of concern in the state of Montana about managing bison. This issue is very active in the state's political scene at the moment, and it's by no means true, as the plaintiffs allege, that it's not the case that bison will be tolerated without restriction outside of the park in Montana. So there's still a need for bison management. The agencies are working with the Park Service and the Forest Service are working with APHIS and two state agencies on an ongoing basis. They involve the public regularly. Meetings are held between three and seven times a year, and recently the agencies have also put forth their plan for managing the bison for the upcoming year. If the plaintiffs have a problem with the way that the Park Service and the Forest Service are managing bison in the future, the plaintiffs need to bring a specific challenge to upcoming decisions, which they haven't done in this case here. Unless the Court has further questions about this, I will. I don't believe that we do. Thank you, counsel. Thank you. I would ask the Court that it affirm the judgment of the district court. Thank you. Ms. Nelson, you have some time remaining. Your Honors, the Court is correct when it notes that NEPA does not allow this plan to go on indefinitely without ever evaluating new information and changed circumstances, particularly when the plan's own modeling of impacts and analysis and development of appropriate alternatives expires in 2014 and agencies will be going forward without that information. Is there some reason to doubt the validity of the statement that these meetings that are occurring periodically will continue to occur into the indefinite future? Is that wrong? Your Honor, I don't doubt that the agencies will continue to have meetings, but they aren't meeting the statutory or regulatory requirements of NEPA. There's no submission of public comment that the agencies must respond to under NEPA. There's no application of significance criteria. There's no compilation of all the information and primarily looking at what new alternatives are possible. As the remand from the Marsh Court, the Harrell case indicates that when an underlying purpose of action changes, agencies have to look at what alternatives change. Have the alternatives changed? Do we still need to kill bison regularly, sometimes 1,000 in a season, to protect cattle? Did you challenge the authority of the Park Service to kill bison? We did, Your Honor. Do you challenge the authority of the Park Service to kill bison? Yes, Your Honor. Why? Because of their statutory duties to prevent impairment, to prevent wanton destruction. But there's also statutory language that gives them authority to dispose of bison. Your Honor, the only direct and express statutory authority to destroy wildlife by the Park Service is that that gives them the authority when there's detriment to the park. And, in fact, when they say that the statute saying they can dispose of surplus bison gives them authority to kill, there's nothing in that statutory language that does give that authority expressly or directly. And, in fact, their own regulations say they won't transfer bison out of the park under that surplus authority if those bison are to be killed or hunted prematurely. And so their own regulations actually prevent disposing of bison if they're going to be killed. So there's actually no express and direct authority. And under Section 1 and Section 1A1 of the Park Service Organic Act, they can only act in contravention of their conservation and no impairment duties towards wildlife and other park resources if there's direct and specific authority to do so. Counsel, you have used your time, but if you'd like to sum up in a sentence or two, you may do so. Thank you, Your Honor. I just ask that the Court recognize that the agencies have not made their own significance determination, have not shown in the record how the Gallatin National Forest is planning in any way for bison on the forest or the Park Service has demonstrated what is wanton destruction, impairment, and conservation, how they're meeting those mandates, and reverse the district court. Thank you. Thank you, Counsel. The case just argued is submitted. We appreciate both counsel's helpful arguments in this case, and we will stand adjourned for this session.
judges: Noonan, Graber, Rawlinson